UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

JIMMY RAY CURETON,                    )
                                      )
              *Petitioner*,           )
v.                                    )        No.:  3:07-cv-294
                                      )               (VARLAN/SHIRLEY)
DAVID MILLS, Warden,                  )
                                      )
              *Respondent*.           )

## MEMORANDUM

This is a petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by

petitioner Jimmy Ray Cureton ("Cureton").  The matter is before the Court on respondent's

answer to the petition and Cureton's reply.  For the following reasons, the petition for the writ

of habeas corpus will be **DENIED** and this action will be **DISMISSED WITH**

**PREJUDICE**.

I.    Standard of Review

Under Rule 8 of the Rules Governing Section 2254 Cases In The United States

District Courts, the Court is to determine, after a review of the answer and the records of the

case, whether an evidentiary hearing is required.  If no hearing is required, the district judge

is to dispose of the case as justice dictates.  If the record shows conclusively that Cureton is

not entitled to relief under § 2254, there is no need for an evidentiary hearing and the petition

should be denied.  *Baker v. United States*, 781 F.2d 85, 92 (6th Cir. 1986).

II.    Factual Background

The respondent has provided the Court with copies of the relevant documents as to Cureton's direct appeal and post-conviction proceedings. [Doc. 7, Notice of Filing Documents, Addenda 1-16]. Cureton was convicted by a jury, in the Criminal Court of Knox County, Tennessee, of felony murder and attempted especially aggravated robbery. The trial court, on motion of the defense, reduced the conviction for attempted especially aggravated robbery to attempted aggravated robbery, and sentenced Cureton on the felony murder and attempted robbery convictions to consecutive prison terms of life with the possibility of parole and five years, respectively. On direct appeal, the Tennessee Court of Criminal Appeals affirmed the felony murder conviction, reinstated the conviction for attempted especially aggravated robbery, and remanded for resentencing on the reinstated conviction. *State v. Cureton*, 38 S.W.3d 64 (Tenn. Crim. App.) [Addendum 6], *perm. app. denied, id.* (Tenn. 2000) [Addendum 8].

In affirming the felony murder conviction and reinstating the attempted especially aggravated robbery conviction, the Tennessee Court of Criminal Appeals summarized the facts of the case and the evidence presented at trial as follows:

> On January 26, 1990, Windham "Bill" Frye was shot and killed outside the Corner Market & Deli in Knoxville. Frye, the owner of the Corner Market & Deli, had worked that night with two of his employees, Shawn Ferrell and Daniel Sabol. At some point during the night, the defendant and Johna Zack Massey entered the store to purchase cigarettes. After arguing with Frye over the price of the cigarettes, the defendant and Massey left the store. Ferrell and Sabol left the store shortly before 8:00 p.m., the normal closing time. At approximately 8:22 p.m., the Knox County Sheriff's Department received a call about a shooting at the store. When law enforcement officers arrived, Frye

2

was lying near death, close to the front door of his store. The defendant and Massey were questioned after the shooting occurred, but neither was charged at that time.

Although the investigation of the shooting continued after 1990, no significant progress was made. After investigating officers received additional information in February 1996, the defendant was taken into custody. April Joiner, one of the defendant's co-workers at a Blount County Taco Bell in 1994, apparently saw his picture on a television news show and telephoned the Knox County Sheriff's Department regarding knowledge she had of the matter. The defendant was charged with the homicide. Because the defendant was 17 at the time of the shooting, the trial court conducted a hearing to determine whether he should be tried as a juvenile or as an adult. After considering the evidence and testimony presented, the trial court ordered that he be tried as an adult. The trial was conducted on May 18, 19, and 20, 1998, in the Criminal Court for Knox County. In view of the nature of the evidence, a review of the testimony presented at trial is necessary for our discussion.

Jackie Fish, who, at the time of the shooting was a sergeant with the Knox County Sheriff's Department in charge of crime scene investigation, testified for the State. On the night of January 26, 1990, Sergeant Fish arrived at the scene of the shooting, secured the area, and collected evidence. Frye's body was lying outside the store. Fish stated that a bank bag containing $6,856.61 in cash and $22,865.75 in business checks was found by the victim's body. Above Frye's hand was a handgun loaded with four bullets and one spent casing, indicating the gun had been fired once.

Benny Abbott, who lived across the street from the Corner Market & Deli, testified that he heard a shot shortly after 8:00 p.m. the night of the shooting. He ran to the back door of his home and saw Frye in front of the store, bent over and facing south. Abbott told his wife to call 911 and then ran to assist Frye. As Abbott ran toward Frye, he saw Frye stumble to his feet, fire a pistol into the air, and then fall to the ground. According to Abbott, Frye said only, "help me, please help me." Abbott did not notice anything unusual at the store, nor did he see anyone running away from the shooting.

The first officer to arrive at the scene was John Carter, a detective with the Knox County Sheriff's Department. Carter stated that he arrived at the scene of the shooting about six minutes after he received a call from his dispatcher. When he arrived, Frye was lying face down in front of the store surrounded by a group of four or five people. Carter dispersed the crowd and

3

tried to assist Frye. Carter rolled Frye over onto his back and saw that he was having trouble breathing and was bleeding from around his throat and mouth. Next to Frye's body were a money bag and a pistol.

Brenda Canatzer, the defendant's girlfriend at the time of the shooting, testified that the defendant called her at home the day after the shooting. According to Canatzer, the defendant said he was being accused of murder, but did not do it. He told Canatzer he went to Frye's store to buy cigarettes, but did not have enough money. He told her that he left the store to go to a friend's house for more money. When he returned to the store, Frye was dead.

April Joiner, the defendant's shift manager at a Blount County Taco Bell in 1994, testified that in either August or September of 1994 she gave the defendant and Dante Carr, another Taco Bell employee, a ride home from work at 3:30 a.m. When the three arrived at the defendant's apartment, Carr and the defendant began drinking malt liquor. At some point after they arrived, the defendant asked Joiner if she remembered "the guy getting shot over in south Knoxville." The defendant then showed Joiner a scrapbook containing two articles about the shooting, as well as Frye's obituary. Several paragraphs in one article were highlighted. The highlighted portions of the article stated that two juveniles seen at the store the night of the shooting were being questioned. This scrapbook was admitted into evidence. Joiner testified she asked the defendant if he knew who did the shooting and that he replied, "I was the triggerman." Joiner stated the defendant also told her that after the shooting "they" ran behind a bar on the railroad tracks across the street from the store where "they" buried the gun and watched the scene as onlookers and sheriff's deputies arrived. Joiner testified that the defendant never named any other persons involved nor identified what kind of gun was used, but did describe the events as including someone in addition to himself.[1]

> [1]At the defendant's acceptance hearing, Joiner testified that he told her three persons were involved in the shooting.

On cross-examination, Joiner testified she had been a regular marijuana user for eight years and that she pleaded guilty to theft in 1993. Joiner described the defendant's demeanor as "nonchalant" or "bragging" when he made the statement that he was the triggerman. A few weeks after he told her about his involvement in the shooting, Joiner told her stepfather about the incident. Joiner's stepfather then told the Frye family about the defendant's statements, but, according to Joiner, the family did not take action because the defendant already had been cleared by the police. Joiner called the police and

provided this information in February 1996, after a television news program asked for information about the shooting. Joiner took no further action with regard to the shooting or the defendant's statements.

Shawn Ferrell testified that he and Daniel Sabol were employees at the Corner Market & Deli the night of the shooting. He stated that the night of the shooting was unusual because Frye had told Ferrell and Sabol to go home early. The normal practice was for Frye to close the store at 8:00 p.m. Ferrell and Sabol would leave with Frye and watch him lock the store. The three would then get into their cars and drive away. Frye carried a pistol and a money bag as he left. Because the shooting was on a Friday, Frye would have had more money in the bag than normal to cash customers' paychecks. Ferrell stated that, on the night of the shooting, the defendant came into the store to buy cigarettes but did not have enough money. Massey came in later and paid for the cigarettes. Massey and the defendant then left.

On cross-examination, Ferrell stated he did not remember much about the night of the shooting, but that the statement he gave to police shortly after the shooting was accurate. In that statement, Ferrell said that the defendant came into the store to buy cigarettes, but did not have enough money. Massey paid for the cigarettes and the two left the store. According to Ferrell's statement, there was no argument between the defendant and Frye over the cigarettes.

Daniel Sabol, who had worked at the store the night of the shooting, testified that he was working the cash register when the defendant tried to buy cigarettes. The defendant was a few cents short and argued with Sabol and Frye about the purchase price of the cigarettes. Massey came into the store and asked Frye to "let me slide on it." Frye told Massey and the defendant to take the cigarettes and leave. Sabol also testified Frye had a standard routine for closing the store. Usually the three employees would leave together, but the night of the shooting Frye told Sabol and Ferrell they could leave early. Ferrell left before Sabol, and Sabol left the store before closing.

On cross-examination, Sabol testified he remembered the events of the night of the shooting very well. Although in his original statement to police given three days after the shooting Sabol did not mention an argument between Frye and the defendant, at trial he stated he remembered "words exchanged" over the cigarettes.

5

Kimberly Denise Conner testified as a State's witness that she saw the defendant and Massey at the store the night of the shooting. They were outside the store thirty to forty-five minutes before the store closed.

On cross-examination, Conner stated she did not see the defendant or Massey with a weapon of any kind the night of the shooting. Conner also stated her father collected newspaper clippings about the shooting, and she knew several people who had done the same because they knew Frye.

Dr. Elvin V. Davidson testified as an expert witness for the State. Dr. Davidson was a surgeon in private practice and an assistant medical examiner for Knox County at the time of the shooting. He was called to the store the night of the shooting. Based upon his observations at the scene and his examination of Frye's body, Dr. Davidson concluded Frye died as a result of a shotgun wound to the lower face, neck, and chest. On cross-examination, Dr. Davidson testified that nothing from his observations pointed to a particular person who may have killed Frye.

Mike Upchurch, a detective with the Knox County Sheriff's Department when the shooting occurred, also testified as a State's witness. He participated in the initial investigation of the shooting and worked on the investigation throughout the history of the case. Upchurch and Lieutenant Larry Johnson interviewed the defendant and Massey the evening of the shooting. According to Upchurch, the defendant stated he was at the store the night of the shooting. The defendant said that he and Massey went to the store to buy cigarettes, but did not have enough money. After buying the cigarettes, the defendant and Massey left the store and went to the apartment of Massey's uncle. Someone told them that the police were looking for a yellow Gremlin automobile. They had been riding in Massey's Gremlin that night, so they decided to return to the store to find out what the police wanted. At that time, the defendant did not profess to have any knowledge as to how Frye was killed. Upchurch stated a search was conducted in the immediate area of the store, but no murder weapon was found. He stated that in 1996 after April Joiner provided law enforcement authorities with information, the Criminalistics Unit of the Knox County Sheriff's Department conducted a search across the street from the store in the area where the defendant told Joiner the gun was buried. The area had changed in the six years since the shooting, however. Several mobile homes were parked there and the parking lot had been paved.

On cross-examination, Upchurch testified that he did not know when the 1996 weapon search occurred. He stated that he did not know of any tests

that were run on bloodstains near Frye's body. No hair or fiber evidence was collected at the scene of the shooting. The defendant's hands and clothes were not tested for gunpowder residue the night of the shooting. An inventory search of Massey's Gremlin revealed no shotgun or weapon of any kind. Upchurch stated that several persons other than the defendant claimed to have killed Frye. Part of his investigation involved the trial of two defendants, Johnson and Gibson, for an earlier burglary of the Corner Market & Deli. Johnson and Gibson were scheduled to go to trial February 7, 1990, for a burglary to which Frye was the only witness. Reportedly, someone offered a bribe in exchange for Frye's not recognizing the persons involved in the burglary.

From February 1990 to February 1996, Upchurch did not have any contact with the defendant. Based on additional information, Upchurch and Knox County Sheriff's Deputy Dan Stewart took the defendant into custody around lunchtime on Friday, February 23, 1996. The defendant was not placed under arrest until 9:00 or 10:00 a.m. on Sunday, February 25, 1996. Upchurch stated that the defendant never asked to leave the police station before he was arrested. He gave several statements while at the police station. In none of these statements did the defendant ever admit any involvement in the death of Frye, nor did he say that he attempted to rob him.

Brian Stannard, a patrolman with the Knox County Sheriff's Department when the shooting occurred, testified as a State's witness. By the time of trial, he was a lieutenant with the sheriff's department. Stannard participated in the interview of the defendant on January 26, 1990. A tape of the interview and a transcript of the tape were presented to the jury during Stannard's testimony. In this statement, the defendant denied any involvement in the shooting. On cross-examination, Stannard testified that the defendant cooperated fully during the January 26, 1990, interview and, at all times, denied any involvement in the shooting.

Dan Stewart, a detective with the Knox County Sheriff's Department both when the shooting occurred and when the defendant was interviewed in February 1996, testified that he conducted interviews with the defendant on February 23, 24, and 25, 1996. Tape recordings of the defendant's statements were admitted into evidence and played for the jury during Stewart's testimony. In all three statements, the defendant stated that on the night of the shooting, he and Massey had gone in Massey's car to the Corner Market & Deli to buy cigarettes for the defendant's cousin. The defendant attempted to buy the cigarettes but was a few cents short. He returned to Massey's car to

7

look for change. In the course of searching for change, he saw a sawed-off shotgun under a pile of clothes in the back floorboard of the car. After helping the defendant look for change in the car, Massey went into the store and bought the cigarettes. The defendant's three statements have somewhat different versions of what Massey said when he returned to the car from buying the cigarettes. In the defendant's first statement, he said that Massey had told him, "F---that old man. I'd robbed his old ass if he didn't have a gun." In his statement given the following day, the defendant remembered Massey as saying, "That old bastard is gonna pay. Me and mama is never going to go in there again ... I ought to rob the old bastard and take a whole carton just to piss him off." In his third statement, the defendant recounted that Massey had said that "he was gonna rob the old bastard."

The three statements also presented somewhat differing versions of what occurred after Massey had made a threatening statement. In his first statement, the defendant said only that he had waited in the car while Massey "was going to these two girls' apartment." He said that this apartment was located between two and five miles from the Corner Market. While sitting in the car, the defendant heard "either a gunshot blast or a car backfiring." After additional questioning, he said that it was a "gunshot blast." Massey returned to the car about ten minutes later and said, "Well, this matter is taken care of." As they pulled out of the apartment parking lot, they heard "ambulances and police cars" and drove back to the Corner Market, stopping at the edge of the parking lot. Officers at the scene made the two get out of their car while it was searched.

In his second statement, the defendant related that Massey told him to wait in the car while he went into some apartments. Massey then picked up the pile of clothes that was in the car, and the defendant assumed that the shotgun was in the pile. After additional questioning, the defendant described the pile of clothing as a "towel or small blanket or something" and said that Massey took the towel and shotgun with him as he left the car. As the defendant sat in the car, he saw Massey go around the apartment building but not into an apartment. Massey was gone for fifteen or twenty minutes, and while he was gone, the defendant heard "a loud boom" which he assumed to be a gunshot. Massey returned to the car five to seven minutes later, saying, "All this matter is taken care of, and let's go." Massey had nothing in his hands when he came back to the car. As they pulled out of the apartment parking lot, they saw police cars and followed them back to the Corner Market & Deli, where their car was searched by law enforcement officers.

8

In his third statement, the defendant said that Massey pulled the car into "somebody's driveway and seen that nobody was home. There was like a dark, wooded area." This location was "not even a block" from the Corner Market & Deli. According to the defendant, Massey turned off the engine and lights and then "got out of the car and kinda cupped the stock of the gun in his left hand with the barrel going up his arm, down by his side." He told the defendant that he was "going to go rob Bill Frye." The defendant remained in the car, drinking a beer. He "heard one loud explosion and then a little-a gunshot." He told officers that he "knew that something went wrong, or something, that one of them got shot." Massey returned to the car, throwing the shotgun and a mask into the back. At some point, Massey told the defendant that "things went wrong, [that] Bill pulled a gun out on him, so he had to fire his gun or whatever so he could escape so he wouldn't get shot." With Massey driving, they went past the store "squealing tires" to Kelly Lowe's house. She was the best friend of Brenda Canatser, the defendant's girlfriend. The defendant gave the mask to Lowe and told her to "burn it." They then went to an apartment building, where Massey said that "there was two girls there that he knew and he was wanting to drop off the gun." While the defendant waited in the car, Massey got out, "wrapped up the gun in a towel," and went around the side of the building. Massey returned to the car in a few minutes and told the defendant, "Let's go back to the store so that we wouldn't look suspicious or something. Just go back and act like we're stupid or something, like we're looking around to see what happened." As they were on the corner of the parking lot at the crime scene, Massey got out of the car, while the defendant remained inside. Officers came over and questioned both of them. The defendant said that he gave a false statement because he "was scared for [his] life." He said Massey told him that "snitches can end up dead."

Based upon the defendant's statements during the interviews and April Joiner's statement about the scrapbook she had seen in 1994, Stewart obtained a search warrant for the defendant's residence. As the warrant was being executed on February 29, 1996, Stewart found the scrapbook containing the newspaper clippings regarding Frye's death.

On cross-examination, Stewart testified he knew of no one who was an eyewitness to the shooting, nor did he know of anyone who saw the defendant involved in Frye's murder. After Stewart's testimony, the State rested. The defense called no witnesses and rested as well.

On May 20, 1998, the jury returned a verdict of guilty on the charges of felony murder and attempted especially aggravated robbery. The defendant

moved for a new trial on August 20, 1998. The trial court held a hearing on his motion on August 28, 1998. At this hearing, Mike Upchurch testified that, contrary to his testimony at trial, no formal search was conducted in 1996 in the area where the defendant told Joiner the gun was buried. At best, only a visual inspection of the area took place. Among other alleged trial errors set out in the motion for new trial, the defendant also complained of discovery violations involving the State's admitted failure to provide requested information relating to rewards offered for information involving the shooting. The trial court denied the motion for a new trial, but reduced the conviction for attempted especially aggravated robbery to attempted aggravated robbery. The defendant timely appealed his convictions.

*Id.*, 38 S.W.3d at 67-73 (footnote omitted)

On remand, the trial court sentenced Cureton to a term of prison of ten years on the attempted especially aggravated robbery conviction, to be served consecutive to his life sentence, and the Tennessee Court of Criminal Appeals affirmed. *State v. Cureton*, No. E2001-01511-CCA-R3-CD, 2003 WL 179856 (Tenn. Crim. App. Jan. 28, 2003) [Addendum 11].

Cureton then filed a petition for post-conviction relief, in which he alleged two instances of ineffective assistance of counsel. The petition was denied after an evidentiary hearing and the Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief. *Cureton v. State*, No. E2005-02491-CCA-R3-PC, 2006 WL 2633072 (Tenn. Crim. App. Sept. 14, 2006) [Addendum 14], *perm. app. denied, id.* (Tenn. Dec. 18, 2006) [Addendum 16].

In support of his federal petition for the writ of habeas corpus, Cureton alleges the following: (1) the evidence was insufficient to support his convictions; (2) his rights to due process were violated when the prosecution introduced false and misleading evidence; (3)

10

his Sixth Amendment right to present a defense was violated when the trial court excluded evidence of third party guilt; (4) he was denied a fair trial when the prosecution suppressed exculpatory evidence; (5) his conviction of attempted especially aggravated robbery was barred by the statute of limitation; (6) his sentence was erroneously enhanced and he should not have received consecutive sentences; (7) the indictment failed to properly charge attempted especially aggravated robbery; and (8) he received ineffective assistance of counsel. The respondent contends he is entitled to judgment as a matter of law as to each claim based upon the findings of the Tennessee state courts or because the claim is not cognizable in federal habeas corpus proceedings.

III.    State Court Findings

Pursuant to 28 U.S.C. § 2254(d), Cureton may not obtain federal habeas corpus relief with respect to a claim that was adjudicated on the merits in a state court proceeding unless the state court decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law or (2) was not reasonably supported by the evidence presented to the state court. In addition, findings of fact by a state court are presumed correct and Cureton must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e).

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362 (2000), clarified the distinction between a decision "contrary to," and an "unreasonable application of," clearly established Supreme Court law under § 2254(d)(1). A state court decision is "contrary to"

Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id*. at 413. A state court decision "involves an unreasonable application of clearly established Federal law" only where "the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409. A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

IV.    Discussion

*A. Sufficiency of the Evidence*

Cureton alleges the evidence was insufficient to support his convictions for felony murder and attempted especially aggravated robbery. According to Cureton, the evidence against him was wholly circumstantial and thus his conviction constituted a violation of due process.

In a federal habeas corpus proceeding in which a state prisoner challenges the sufficiency of the evidence supporting his conviction, the petitioner "is entitled to a determination whether the record evidence could support a finding of guilt beyond a reasonable doubt." *Moore v. Duckworth*, 443 U.S. 713, 714 (1979). However, Cureton is entitled to habeas relief only "if it is found that upon the record evidence adduced at the trial

no rational trier of fact could have found proof beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). *See Brofford v. Marshall*, 751 F.2d 845, 856 (6th Cir. 1985).

When reviewing a jury's verdict under a sufficiency of the evidence standard, a court must consider all the evidence in a light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. at 319. Witness credibility is an issue to be left solely within the province of the jury, *Deel v. Jago*, 967 F.2d 1079, 1086 (6th Cir. 1992); *United States v. Schultz*, 855 F.2d 1217, 1221 (6th Cir. 1988), and substantial deference should be given to the trier of fact. *United States v. Ayotte*, 741 F.2d 865, 867 (6th Cir. 1984). "[T]he federal court sitting in habeas should not attempt to substitute its own opinion for that of the jury which convicted the petitioner." *York v. Tate*, 858 F.2d 322, 329 (6th Cir. 1988). A conviction should be affirmed if *any* rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Bourjaily*, 781 F.2d 539, 544 (6th Cir. 1986), *aff'd*, 483 U.S. 171 (1987).

The Tennessee Court of Criminal Appeals on direct appeal considered Cureton's claims of insufficient evidence. The appellate court first articulated the standard for challenging the sufficiency of the evidence to support a conviction:

A defendant challenging the sufficiency of the evidence to support a conviction faces a heavy burden. The standard of review for a challenge to the sufficiency of the evidence is whether, after considering all the evidence in the light most favorable to the State, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. In determining the sufficiency of the evidence, we will not reweigh the evidence or substitute our own inferences for those drawn by the trier of fact. Instead,

13

on appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom. At this stage, it is the defendant who bears the burden of proving the evidence is insufficient to support the jury's verdict. A guilty verdict rendered by the jury, and approved by the trial judge, accredits the testimony of the witnesses for the State. It is at this point that the presumption of innocence is replaced by a presumption of guilt.

*State v. Cureton*, 38 S.W.3d at 72-73 (citing *Jackson v. Virginia*, 443 U.S. 307, 324 (1979))

(other internal citations omitted).

With respect to the charge of felony murder, the court noted that "the State proposed two possible theories of the case: the defendant killed Frye in a failed robbery attempt, or, in the alternative, Massey killed Frye in a failed robbery attempt and the defendant was criminally responsible for Massey's actions." *Id*. at 73. The court then concluded that "the evidence presented at trial was sufficient to support the conviction based upon either theory."

*Id*. The court reasoned as follows:

Under the theory that the defendant killed Frye in a failed robbery attempt and was therefore guilty of felony murder, the State was required to prove "a reckless killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb." Contrary to the defendant's assertion that the evidence against him was entirely circumstantial, the State presented direct evidence of the defendant's guilt. Through April Joiner's testimony, the State introduced a confession, the defendant's statement, "I was the triggerman." A confession by a defendant is direct evidence of his guilt. Circumstantial evidence of a failed robbery attempt also exists. "Robbery is the intentional or knowing taking from the person of another property of any value by violence or putting the person in fear." At trial, testimony revealed that Frye was killed as he closed his store. He carried a money bag containing $6,856.61 in cash. The evidence also suggested Frye drew his pistol when confronted. These facts support the conclusion that a failed robbery attempt had occurred.

14

The defendant argued at trial, and now argues on appeal, that Joiner was not a credible witness and should not have been believed. He also argues the evidence presented does not adequately support the theory of a failed robbery attempt. Questions of witness credibility and the weight and value of the evidence presented, however, are properly resolved by the trier of fact.

Evidence also exists to support the State's theory that Massey killed Frye in a failed robbery attempt and the defendant was criminally responsible for Massey's actions. To establish that he was criminally responsible for Massey's actions, the State was required to present evidence to show that the defendant acted with intent to promote or assist the commission of robbery and he solicited, directed, aided, or attempted to aid Massey to commit the offense.

Kimberly Denise Conner saw the defendant and Massey outside the Corner Market & Deli the night of the shooting. Ferrell and Sabol said Massey and the defendant came into the store together and bought a pack of cigarettes not long before the shooting. In one of the defendant's statements to sheriff's deputies, he quoted Massey as saying, "I ought to rob the old bastard and take a whole carton." The defendant said he waited in the car while Massey went back to the store. After Massey returned, the defendant took Massey's ski mask to Kelly Lowe and asked her to burn it. These facts support the conclusion that the defendant acted with the intent to assist Massey in an attempt to rob Frye. Based on this testimony, the jury could have found the defendant guilty of felony murder based on criminal responsibility.

*Id.* at 73-74 (quoting Tenn. Code Ann. §§ 39-13-202(a)(2) (Supp.1989) and 39-13-401

(Supp.1989), respectively) (internal citations and footnote omitted).

The Tennessee Court of Criminal Appeals further reasoned that the evidence

supported the conviction of attempted especially aggravated robbery:

The same analysis holds true for the verdict of guilty for attempted especially aggravated robbery. For this charge, the State was required to prove either that (1) the defendant attempted to commit robbery with a deadly weapon and Frye suffered serious bodily injury, or (2) Massey attempted to commit robbery with a deadly weapon, Frye suffered serious bodily injury, and the defendant was criminally responsible.

As previously discussed, the State presented evidence that Frye was killed in a failed robbery attempt and his death resulted from a shotgun wound. Either the jury chose to believe that the defendant killed Frye while trying to rob him, or that Massey killed Frye while trying to rob him and the defendant was criminally responsible. A review of the record reveals sufficient evidence to support either conclusion.

*Id*. at 74 (citing Tenn. Code Ann. §§ 39-13-403 and 39-11-402 (1991)) (footnote omitted).

This Court has reviewed the transcript of Cureton's trial [Addendum 1, Vol. 4-6, Transcript of Evidence at Trial, vol. II-IV, pp. 145-369] and finds the decision by the Tennessee Court of Criminal Appeals is supported in the record.

April Joiner testified that Cureton showed her the scrapbook with the newspaper clippings and stated that he was "the triggerman" in the shooting of Bill Fry. [*Id*., Vol. 5, Transcript, vol. III, p. 238]. He also stated that after the shooting "they run behind the bar on the railroad tracks across the street after it was done and watched the law for a few minutes." [*Id*. at 239]. Ms. Joiner also testified that Cureton told her the weapon "was put in the dirt behind the bar." [*Id*.]. Ms. Joiner identified the scrapbook and the articles. [*Id*. at 240-41].

Daniel Sabol testified as to the verbal exchange between himself, Frye, Cureton, and Massey regarding Cureton's attempt to purchase cigarettes and being a few pennies short. [*Id*. at 275-76]. Mr. Sabol stated that Frye finally let Cureton and Massey "slide" on being short of change. [*Id*. at 276]. He admitted on cross-examination, however, that when he gave his statement to the police three days after the killing he stated that Massey eventually

brought in the rest of the money to pay for the cigarettes and there was no real dispute. [*Id.* at 278-79].

Detective Upchurch testified as to the oral interview of Cureton and Massey on the night of the killing. [*Id.* at 289-91]. He admitted he had heard that at least three other persons had claimed to have killed Bill Frye. [*Id.*, Vol. 6, vol. IV, pp. 304-05]. He also admitted that one of those persons was Mr. Johnson, who was scheduled to go to trial for the burglary of the Corner Market and Deli, and that Bill Frye was the only witness to the burglary. [*Id.* at 305].

Detective Stewart testified that he was present during Cureton's interviews in 1996. [*Id.* at 337-40, 344-49]. Detective Stewart also identified the scrapbook that had been taken from Cureton pursuant to the search warrant. [*Id.* at 351-52].

Based upon the foregoing, the decision of the Tennessee Court of Appeals that the evidence was sufficient to support the convictions of felony murder and attempted especially aggravated robbery was neither contrary to, nor did it involve an unreasonable application of, federal law as established in *Jackson v. Virginia*. Cureton is not entitled to habeas relief on this claim.

### B. Introduction of False Evidence

Cureton alleges that the credibility of April Joiner was crucial to the case. To bolster her testimony, Cureton argues that the prosecution introduced false and misleading testimony through Detective Mike Upchurch, who testified that officers had searched the area where

17

Ms. Joiner said the murder weapon was buried when in fact the officers had not done so.

This issue was considered and rejected by the Tennessee Court of Criminal Appeals on direct appeal:

> The defendant alleges the State knowingly introduced false testimony through Detective Mike Upchurch. On direct examination, Upchurch testified that in 1996 the Criminalistics Unit of the Knox County Sheriff's Department conducted a search across the street from the Corner Market & Deli in the area where the defendant told Joiner the gun used to kill Frye was buried. On cross-examination, Upchurch stated that he did not conduct the search, had no personal knowledge of the search, did not order the search, and was not present when the search took place. At the hearing on the motion for a new trial, Upchurch testified that a search did take place after Joiner's statement to investigating officers, but the search consisted of only a visual inspection. The defendant characterizes Upchurch's statements during direct examination and cross-examination as false testimony and argues that he was prejudiced because Upchurch's false statements gave undue credibility to Joiner's testimony.
>
> A review of Upchurch's testimony at trial and at the hearing on the motion for a new trial reveals that the testimony was difficult to follow. Nothing in the record, however, suggests the State knowingly introduced false testimony. In fact, the record shows that defense counsel extensively cross-examined Upchurch about the search and any inconsistencies in Upchurch's recollection of the events of the search. Even assuming arguendo that Upchurch's testimony was false rather than merely confusing, and that the State knowingly presented the false testimony, the defendant has failed to show the testimony was material.

*State v. Cureton*, 38 S.W.3d at 75 (footnote omitted).

The law is well-settled that to vacate a sentence on the grounds of perjured testimony, the defendant must prove not only that he was convicted by perjured testimony but also that the false statements were material and that the prosecuting officials at the time the testimony

18

was used knew that it was perjured. *See, e.g., United States v. Bagley*, 473 U.S. 667, 679-80

(1985); *United States v. Farley*, 2 F.3d 645, 655 (6th Cir. 1993).

> [I]t is the knowing use by the Government of false evidence that
> constitutes the denial of due process. An allegation of perjury, apart from an
> allegation of knowing use by the Government of that perjury, constitutes no
> basis for habeas corpus or coram nobis relief as it alleges no error of
> constitutional dimensions. The credibility of witnesses is ordinarily for trial
> by the jury in the criminal trial. False evidence and perjury are matters that
> may be raised on the trial and on motions for a new trial, but not in habeas
> corpus, Section 2255, or other post-conviction petitions.

*Hoffa v. United States*, 339 F. Supp. 388, 392 (E.D. Tenn. 1972), *aff'd*, 471 F.2d 391 (6th Cir.

1973).

The Court has reviewed the transcript of Detective Upchurch's testimony at trial

[Addendum 1, Vol. 5-6, Transcript, vol. III-IV, pp. 286-327] and his testimony at the hearing

on the motion for new trial [*id*., Vol .7, Transcript, vol. IV, pp. 461-65]. The findings of the

Tennessee Court of Criminal Appeals are supported in the record. The decision by the

appellate court that the prosecution did not introduce false testimony was neither contrary

to, nor did it involve an unreasonable application of, established federal law. Cureton is not

entitled to habeas relief on this claim.

### C. Denial of Right to Present Evidence of Third Party Guilt

Cureton alleges he was not allowed to present evidence of a third party's guilt in this

matter, in violation of his Sixth Amendment right to present a defense as well as his

Fourteenth Amendment right to due process. He specifically refers to a letter purportedly

written by Andre Johnson, in which Johnson admitted his guilt in the murder. The trial court deemed the letter inadmissible as hearsay and also because it could not be authenticated.

On direct appeal, Cureton challenged the trial court's ruling on the basis of the Tennessee Rules of Evidence and related Tennessee case law. [Addendum 4, Brief of the Appellant, pp. 15-19]. The Tennessee Court of Criminal Appeals considered the claim and denied Cureton relief based upon Tennessee law. *State v. Cureton*, 38 S.W.3d at 77-80.

Because Cureton raised this issue in the state courts as a matter of state law, "it is not cognizable in a federal habeas corpus proceeding." *Spalla v. Foltz*, 788 F.2d 400, 405 (6th Cir. 1986). *See also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("we reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions"); *Lewis v. Jeffers*, 497 U.S. 764, 779 (1990) ("federal habeas corpus relief does not lie for errors of state law"); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."); *Sinistaj v. Burt*, 66 F.3d 804, 807 (6th Cir. 1995) ("Errors of state law alone cannot form the basis of relief under federal habeas corpus."); *Houston v. Dutton*, 50 F.3d 381, 385 (6th Cir. 1995) ("When and how state law applies to a particular case is a matter on which the state supreme court has the last word. No federal issues are implicated and no federal question is presented in determining whether a change in state law is to be applied retroactively.") (citation omitted).

## D. Prosecution's Suppression of Exculpatory Evidence

Cureton alleges the prosecution suppressed exculpatory evidence, namely the fact that Detective Upchurch did not actually conduct a search of the area for the murder weapon and the fact that a reward was offered and expected by April Joiner. Cureton claims the suppression of this evidence violated his right to due process.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held "that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87. Impeachment evidence as well as exculpatory evidence "falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985). "Favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). *See also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) ("There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.").

With respect to the first issue, that the State withheld evidence that Detective Upchurch did not actually search for the murder weapon, the court rejected that claim in denying relief on the claim that the State introduced false testimony. As to the second issue

regarding the reward, the Tennessee Court of Criminal Appeals considered the claim on

direct appeal:

> In assessing the defendant's claim in this regard, we will first consider the chronology of the matter.

> The victim was killed on January 26, 1990. The then Knox County District Attorney General sent a letter to Governor Ned McWherter on April 23, 1990, asking that the State of Tennessee offer a reward in the case. On May 1, 1990, counsel to Governor McWherter advised that the State would offer a reward of $2,500. According to the testimony of April Joiner, she visited the defendant's apartment in August or September of 1994, when he showed her the scrapbook and told her of his involvement in the crime. As the result of seeing a story about the case on a Knoxville television station, Joiner contacted the Knox County Sheriff's Department regarding her knowledge of the crime.

> On January 22, 1997, counsel for the defendant filed a Brady motion regarding any rewards offered in connection with the homicide. No information was provided to the defense prior to the trial, as to a response of that motion. The trial was conducted on May 18-20, 1998. As April Joiner was being cross-examined during the trial, she testified that, as of 1994, she had used marijuana a "couple of times a week" for about eight years and she had pled guilty to theft in 1993.

> On June 26, 1998, Joiner sent a letter to the Knox County District Attorney General's office requesting payment of the reward and making reference to hardships she had undergone since 1994. One of the *76 assistant district attorneys general, who was also a prosecutor in the trial against the defendant, responded to that letter on July 29, 1998, referring Joiner to the Knox County Sheriff's Department regarding the reward. On August 13, 1998, the Knox County District Attorney General's office provided copies of the April 23, 1990, letter from the Knox County District Attorney General asking that the State offer a reward in the matter, the May 1, 1990, response from the governor's office, and the June 26, 1998, letter from April Joiner seeking the reward. Several matters are left unclear in the record. Although there is a reference to a private reward in the matter, it is not clear whether there was such an award. Additionally, it is unclear as to whether April Joiner was ever paid the reward.

The defendant raised as an issue in his motion for new trial the fact that the State had failed to provide, until after the trial had been completed, information regarding any reward which had been offered in the case. After confirming to the trial court that defense counsel had asked, in discovery discussions prior to the trial, whether a reward had been offered, and that the prosecution had produced no evidence of such an offer, General Bright stated:

> You see my file in front of me, three Expando folders. Nowhere in-in these documents nor in the file provided us by the Sheriff's Department was there any reference to an award. And I believe I can speak for General Helm that she wasn't aware of any award. We did not participate in the 1990 investigation. And, of course, we had a different district attorney and a different secretary for the district attorney.
>
> An award had been requested through our office and had been granted by the governor's office, twenty-five-hundred-dollar award, and this I learned after the trial was concluded. And, also, that an award had been announced, whatever we want to call it, by Norman Frye, the brother of the victim, Bill Frye.
>
> I have been informed that no one has ever contacted the Frye family about that award. Nor did I ever have a discussion with April Joiner, or any other witness, about an award, nor did she mention it to me, because I was unaware of it.
>
> But there was a file. I later found out there was a file in our office, that I was not aware of its existence and-that's my offer.

During his cross-examination of Sergeant Mike Upchurch in the defendant's trial, defense counsel inquired about any rewards which had been offered in the matter:

> Q.  During the course of your investigation, you learned that there were rewards offered for the arrest and conviction of a person in this crime?
>
> A.  I knew of the one reward that-and I was advised that another one had been requested, but I do not know for sure if it was ever granted or not. I know of at least one early on in the investigation.

23

Q.     Those were from private sources?

A.     One was from the victim's brother.

Q.     And then the one you heard was requested would have been officially through the state system?

A.     Through-through the State of Tennessee, yes.

Q.     Have you dealt with those kind[s] of rewards before?

A.     I have not personally, no.

Q.     Do you-is it your understanding that in order to get paid for those rewards, the information has to lead both to an arrest and a conviction?

A.     That's correct.

*State v. Cureton*, 38 S.W.3d at 75-76.

The appellate court then noted the test for a due process violation as set forth in *Brady*,

*Bagley*, *Kyles*, and *Strickler*.  *Id*. at 76-77.  The court finally concluded that Cureton had not

demonstrated a due process violation:

In applying the *Strickler* test to this matter, we consider a number of facts to be relevant. First, we note that the nature of the information inadvertently suppressed is very different from that which is often the subject of a suppression claim. Indeed, the very nature of a reward is that it is meant to have the widest possible dissemination. Although the amounts were not disclosed, the jury learned during the cross-examination of Detective Upchurch that one, and possibly two, rewards had been offered. Even though April Joiner testified that she was inside the defendant's apartment in August or September of 1994, when he told her that he killed the victim and showed her his scrapbook, she did not tell law enforcement authorities of this statement until 1996. Thus, a significant period of time passed between the time when Joiner was told of the defendant's involvement and her contacting authorities with this information. A like period of time passed between the "hardships" Joiner underwent in 1994 and her 1996 statement to law enforcement authorities.

24

> Additionally, as was obvious from the defense's cross-examination of Detective Upchurch, the defense was aware that at least one reward had been offered. Further, since Joiner did not make her request for the reward until several weeks after the trial had been concluded, the defendant could not have been advised by the prosecution that she would later claim the reward. Taking all of these facts into account, it is clear that even if the defense had been advised prior to the trial of additional information regarding any reward offered in the matter, there still is not a "reasonable probability" that "the result of the proceeding would have been different." Given the chronology of this matter, we cannot conclude that the inadvertent suppression of evidence "undermines confidence in the outcome of the trial." Thus, this assignment is without merit.

*Id*. at 77 (quoting *Kyles*, 514 US. at 433-34, and *Bagley*, 473 U.S. at 678, respectively).

This Court has reviewed the transcript of the hearing on the motion for new trial with regard to this issue [Addendum 1, Vol. 7, Transcript, vol. V, pp. 466-68, 471-72] as well as Detective Upchurch's trial testimony [*id*., Vol. 6, Transcript, vol. IV, pp. 325-26]. The findings of the Tennessee Court of Criminal Appeals are supported in the record. The decision by the appellate court that the prosecution's inadvertent failure to disclose evidence of the reward did not prejudice the defense was neither contrary to, nor did it involve an unreasonable application of, established federal law. Cureton is not entitled to habeas relief on this claim.

## E. Statute of Limitation

Cureton alleges his right to due process was violated when the trial court refused to dismiss the charge of attempted aggravated robbery based upon the statute of limitation. The Tennessee Court of Criminal Appeals, however, determined that Cureton was properly charged under Tennessee law with attempted especially aggravated robbery, for which the

25

statute of limitation had not expired. *State v. Cureton*, 38 S.W.3d at 80-84. This issue was considered and rejected on the basis of Tennessee state law and thus is not cognizable in federal habeas corpus proceedings.

## F. Erroneous Sentence

Cureton alleges the trial court erroneous applied enhancement factors to increase his sentence and erroneously ordered his sentences to be served consecutively. This claim was likewise raised, considered, and rejected on the basis of Tennessee state law. [Addendum 9, Brief of the Appellant, pp. 11-16]; *State v. Cureton*, 2003 WL 179856 at **8-11 (Tenn. Crim. App. Jan. 28, 2003) (appeal of resentencing after remand). The claim is thus not cognizable in federal habeas corpus proceedings.

## G. Lack of Proper Indictment

Cureton alleges that he was not properly indicted on the attempted especially aggravated robbery charge and therefore the court's failure to dismiss that conviction violated his right to due process. This argument was the basis for the trial court's reduction of the jury verdict from guilty of attempted especially aggravated robbery to guilty of attempted aggravated robbery; the indictment failed to allege that the victim suffered "serious bodily injury" which is an element of especially aggravated robbery. *State v. Cureton*, 38 S.W. 3d at 81 (citing Tenn. Code Ann. § 39-13-401 (1991)). The Tennessee Court of Criminal Appeals reinstated the jury verdict, however, finding that all counts of the indictment should

be read together and that the remaining counts of the indictment, which referred to the victim's death, put Cureton on notice that the victim suffered serious bodily injury. *Id.* at 80-84.

This matter was originally raised as state law matter. [Addendum 4, Brief of Appellant, pp. 28-31]. The Tennessee Court of Criminal Appeals considered the claim solely as a matter of state law. *State v. Cureton*, 38 S.W. 3d at 80-84. On appeal after resentencing, Cureton again challenged the conviction of attempted especially aggravated robbery as unconstitutional and referred to *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The Tennessee Court of Criminal Appeals, on appeal after resentencing, held that Cureton's argument was foreclosed by the court's prior ruling:

> When this Court remands a case to the trial court, this Court's mandates are controlling with respect to all issues addressed in that appeal. Accordingly, the trial court was not at liberty to reconsider, on remand, this Court's ruling that the defendant's indictment sufficiently alleges the charge of attempted especially aggravated robbery. Thus, we find that the defendant's complaint on this point lacks merit.

*State v. Cureton*, 2003 WL 179856 at *8.

To the extent Cureton's claim of a defective indictment was considered and rejected on the basis of Tennessee state law, it is not cognizable in federal habeas corpus proceedings. *Apprendi* was decided June 26, 2000, which was after Cureton's original conviction for attempted especially aggravated robbery on May 18, 1998. [Addendum 1, Vol. 7, vol. V, Jury Verdict, pp. 423-24]. *Apprendi* cannot afford Cureton relief because it does not apply retroactively. *Goode v. United States*, 305 F.3d 378, 381 (6th Cir.), *cert. denied*, 537 U.S. 1096 (2002).

27

## H.  Ineffective Assistance of Counsel

Cureton alleges two instances of ineffective assistance of counsel.  In *Strickland v. Washington*, 466 U.S. 668 (1984) the United States Supreme Court established a two-part standard for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id*. at 687.

To establish that his attorney was not performing "within the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson*, 397 U.S. 759, 771 (1970), Cureton must demonstrate that the attorney's representation "fell below an objective standard of reasonableness."  *Strickland v. Washington*, 466 U.S. at 687-88.  In judging an attorney's conduct, a court should consider all the circumstances and facts of the particular case.  *Id*. at 690.  Additionally, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  A finding of serious attorney incompetence will not justify setting aside a conviction, however, absent prejudice to the defendant so as to render the conviction unreliable.  *Id*. at 691-92.

Cureton alleges his attorney rendered ineffective assistance of counsel by failing to do the following: (1) request a jury instruction on the lesser included offenses of facilitation to commit felony murder and facilitation to commit especially aggravated robbery, and (2) properly introduce the letter of Andre Johnson. These were the same claims of ineffective assistance of counsel considered and rejected by the Tennessee Court of Criminal Appeals in post-conviction proceedings:

> The petitioner appeals the dismissal of his petition for post-conviction relief, arguing that the post-conviction court erred in finding that trial counsel provided effective representation. Specifically, he argues on appeal that trial counsel was deficient in failing to enter Mr. Johnson's letter into evidence and in failing to request a jury instruction on facilitation to commit felony-murder or facilitation to commit especially aggravated robbery.

*Cureton v. State*, 2006 WL 2633072 at *7.

The appellate court first summarized the evidence at the post-conviction hearing:

> At the post-conviction hearing, Petitioner testified that he was released on bond for two years following his arrest. During that time, he met with trial counsel approximately twelve times. Petitioner had no doubt that trial counsel understood the case and was well-acquainted with the facts of the case. According to Petitioner, his trial counsel never told him that the State had offered a plea bargain agreement.

> Petitioner said that he did not fire the shot that killed the victim, and he never told anyone that he committed the murder. Petitioner did not testify at trial because he was "scared" and "not good around people." He and his trial counsel determined that it would be in his best interest not to testify.

> On cross-examination, Petitioner admitted that there was testimony at trial that three different people had confessed to committing the murder. He agreed that this testimony had the same effect that Mr. Johnson's letter would have had if it had been introduced into evidence. He said that his defense at trial was that he did not commit the crime, and the jury should not have found him guilty of any crime.

On redirect, Petitioner said that prior to obtaining a lawyer, he was interviewed by the police on numerous occasions. One of these interviews extended over a period of three days. During this interview, he never asked for a lawyer. He said that he was not under arrest but voluntarily agreed to answer the police officer's questions for three days.

Trial counsel testified that he represented Petitioner in the trial court and through both of Petitioner's appeals. He said that there was no forensic evidence linking Petitioner to the crime. Essentially, the evidence against Petitioner consisted of Petitioner's statement to April Joiner that he was the triggerman, his scrapbook detailing the crime, and his three inconsistent statements to the police. Trial counsel did not think it was proper that Petitioner was questioned for three days without an arrest. He said that he filed a motion to suppress Petitioner's statements to the police, as well as a motion to suppress his scrapbook. The trial court denied the motions following a hearing, and that denial was affirmed on appeal.

The defense introduced evidence at trial that three other individuals had confessed to the same crime that Petitioner had been charged with. The goal was to demonstrate to the jury that in addition to having confessed to the murder, these other parties also had a better motive than Petitioner for killing the victim. In Mr. Johnson's case, testimony established that he had a motive for killing the victim because he had an upcoming trial in which the victim was supposed to testify against him. The testimony also established that Mr. Johnson had written a letter in which he confessed to killing the victim. The actual letter was not admitted, however significant portions of the letter's content were admitted.

Trial counsel said that the theory of the defense was that Petitioner was not at the scene and did not commit the murder, and that there were other people who had an opportunity and a better motive to kill the victim. He said they also attacked the credibility of Ms. Joiner, highlighted the lack of evidence connecting Petitioner to the crime, and pointed out that although witnesses were at the scene in a matter of seconds, no one saw Petitioner in the area. He said that he did not ask for a jury instruction on facilitation because there was no proof in the record that would support such a request. He said that the State presented multiple theories, and he felt it was in his client's best interest to stick with one theory rather than arguing "we didn't do it, but if we did, we were only facilitating." Trial counsel did not request a change of venue because, due to the

30

length of time since the crime, none of the jury pool had a specific memory of the event.

*Id*. at **6-7.

In analyzing Cureton's claims of ineffective assistance of counsel, the Tennessee Court of Criminal Appeals first noted the standard of review set forth in *Strickland*. "To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Id*. at *7 (citing *Strickland*, 466 U.S. at 687). The appellate court emphasized the two-prong nature of the *Strickland* test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id*. at *8 (quoting *Strickland*, 466 U.S. at 687).

The court observed that "[t]he deficient performance prong of the test is satisfied by showing that 'counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms.'" *Id*. (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688)). The court further observed that "[t]he prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a 'probability sufficient to undermine confidence in the outcome,' that 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id*. (quoting *Strickland*, 466 U.S. at 694).

31

The appellate court next referenced the findings of the trial court and, based upon those findings, concluded that Cureton was not entitled to relief:

The post-conviction court found as follows:

[Petitioner] specifically complains about two things. First, he complains that a letter purportedly written by a Mr. Johnson was not admitted into evidence. He admitted during his testimony that [trial counsel] was able to establish before the jury that three other people besides [Petitioner] had confessed to this crime. And during [trial counsel's] testimony, he expanded on that to explain that not only was he able to elicit testimony showing that three other people, including Mr. Johnson, had confessed but that major portions of this purported letter, which is clearly hearsay and inadmissible, came into evidence through the testimony of some of the state's witnesses.

So it's clear to me that there's no merit to that issue. The very thing that he complains about; that is, the letter from Mr. Johnson admitting his involvement in this crime, that evidence was presented to the jury. So I find that issue to be without merit.

Second, [Petitioner] complains that he failed to ask for a facilitation charge at the conclusion of trial. [Trial counsel] explains that it was Mr.-and [Petitioner] agrees that it was their defense at trial that [Petitioner] was not there; he did not commit this offense. His defense was not that he aided someone else or was somehow responsible for the conduct of somebody else, the facilitation of the crime, but that he wasn't there.

And, indeed, as [trial counsel] explained, he made a strategic decision, a trial decision, that he would not ask for a facilitation charge because he felt that that would lessen their ability to claim that they weren't there at the time of the crime, and he adds that the state had multiple theories which he was able to point out to the jury, and they had a single theory, which he thought was the strongest way to approach this case before the jury. I concur with [trial counsel's] decision in that regard.

32

In any event, a decision made as a matter of trial strategy is not going to be disturbed on post-conviction relief unless there's clear and convincing evidence that it was a faulty decision, and we don't judge that in 20/20 hindsight. But I think, all things considered, it was the proper decision, and it continues to be the proper decision today.

Those are the two issues that [Petitioner] specifically complained of.... I find that there are no grounds to support your petition for post-conviction relief. I believe [trial counsel] performed well above the standard that we apply in this case and the standard of legal representation in this jurisdiction, and therefore, under *Strickland v. Washington* and its [progeny], I do not believe that you have made out a case for post-conviction relief, and it is denied.

We conclude that there is nothing in the record to preponderate against the trial court's findings. Petitioner failed to show that trial counsel's representation fell below the required standard, and he failed to show that he was prejudiced in any way by counsel's performance. It is clear from the record that trial testimony established the pertinent information contained in the letter, including Mr. Johnson's admission to the crime. It is likewise clear that trial counsel made a strategic decision not to request a lesser included facilitation charge. We will not second guess this decision. Petitioner is not entitled to post-conviction relief.

*Id*. at **8-9 (quoting Written Findings of Trial Court).[1] This Court has reviewed the transcript of Cureton's post-conviction hearing [Addendum 3, vol. 2, Transcript of Evidence at Post-Conviction Hearing, pp. 1-26] and finds the decision by the Tennessee Court of Criminal Appeals is supported in the record.

Cureton acknowledged that his attorney, Kenneth Irvine, Jr., was familiar with the case and that the two had had "a lot" of conversations concerning the case. [*Id*. at 8]. They also

---

[1]The written findings of the trial court can be found at Addendum 3, vol. 1, Technical Record, pp. 86-89.

discussed whether Cureton should testify and agreed it was in his best interests to not testify. [*Id*. at 9]. Cureton admitted that his attorney was able to get before the jury the fact that three different people all confessed to the crime. [*Id*. at 13]. He also admitted that his defense was that he did not kill the victim and that he was not there at the time of the killing. [*Id*.].

Mr. Irvine testified that he was "able to develop at least three other people that had also said they killed Mr. Frye, also were from that area, and had better motivations." [*Id*. at 21]. The jury heard that evidence, as well as evidence regarding the letter in which Mr. Johnson confessed to killing Mr. Frye and evidence of Johnson's motivation to do so. [*Id*. at 21-22]. Although he was not able to get the actual letter itself admitted into evidence, he "got a majority of the information out of the letter before the jury." [*Id*. at 22].

Mr. Irvine also testified that he did not ask for a jury instruction on facilitation because, first, there was no proof in the record to support the request. [*Id*. at 24]. In addition, Mr. Irvine noted that the prosecution had multiple theories as to who did the actual shooting. Because he took the prosecution to task for their multiple theories, he did not want to be in the same position:

> And during the closing I spent quite a bit of time saying the state doesn't know. They don't know what their theory [sic] and asked -- told the jury they shouldn't be just picking and choosing; that if the state doesn't know, they should acquit Mr. Cuerton [sic]. So we certainly didn't want to be in that same position of being up there with multiple theories in that it would be a very bad position, in my opinion, to be up there saying, "We didn't do it, but if we did, we were only facilitating." That would be bad in any case but especially bad in this one where I was spending a lot of time taking the state to task because they didn't have one theory they were proceeding on.

[*Id*.].

Based upon the foregoing, Cureton has failed to demonstrate he received ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*. He is not entitled to relief on this claim.

V.   Conclusion

The petition for habeas corpus relief will be **DENIED** and this action **DISMISSED**. Rule 4 of the Rules Governing Section 2254 Cases In The United States District Courts. Cureton having failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability **SHALL NOT ISSUE**. 28 U.S.C. § 2253(c); Rule 22(b) of the Federal Rules of Appellate Procedure. The Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. *See* Rule 24 of the Federal Rules of Appellate Procedure. The Court will further **DENY** Cureton leave to proceed *in forma pauperis* on appeal.

**AN APPROPRIATE ORDER WILL ENTER.**


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE